IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CARLEEN CAREY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-22-2 |
| BALTIMORE CITY BOARD OF SCHOOL COMISSIONERS, | * | |
| | * | |
| Defendant. | | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Baltimore City Board of School Commissioners' ("BCBSC") Motion to Dismiss. (ECF No. 13). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons set forth below, the Court will grant the Motion.

### I.   BACKGROUND[1]

Plaintiff Carleen Carey is a self-identified African American woman previously employed at Baltimore City Public Schools ("BCPS") in the Office of Career Readiness from September 2019 to spring 2021. (Am. Compl. ¶¶ 15, 35, ECF No. 5; Def.'s Br. Supp. Mot. Dismiss ["Mot."] at 1, ECF No. 13-2). Carey allegedly experienced several instances of discrimination and retaliation at BCPS. (Am. Compl. ¶ 15). One of Carey's colleagues, Daniel Heller, lashed out at Carey for unknown reasons in a meeting and Carey reported

---

[1] Unless otherwise noted, the Court takes the following facts from Carey's Amended Complaint (ECF No. 5) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

the incident to Rachel Pfeifer, Executive Director of Career Readiness, on April 20, 2020. (Id. ¶ 16). Pfeifer did not discipline Heller and she told Carey to meet with Heller to discuss the incident. (Id.). Carey felt that Pfeifer unfairly placed the "burden of confronting Mr. Heller" on her because Heller was a man and Carey was a woman. (Id.).

On April 22, 2020, Carey met with Heller, but Pfeifer interrupted their meeting to encourage Carey to apply for an open position as Curriculum Manager. (Id. ¶¶ 15, 17). Carey did not want to apply for the position because she felt it would add to her stress level during the pandemic. (Id. ¶ 17). In May 2020, Pfeifer again contacted Carey about applying for the Curriculum Manager role. (Id. ¶ 18). Pfeifer pressured Carey to apply and implied that if she did not, she "would no longer have a job." (Id.). Carey "felt that the pressure was due to her disagreements with Mr. Heller and that [she] was being pushed out because deference was being shown to Mr. Heller due to his position as a male employee." (Id.). Carey later interviewed for and accepted the Curriculum Manager position, and she was told that it involved "direct responsibilities regarding curriculum." (Id. ¶ 19).

In August 2020, Carey sent an "advocacy email" to the Maryland State Department of Education ("MSDE") requesting support for the "Ag Program," which BCPS planned to close "under false pretenses." (Id. ¶ 21). On September 4, 2020, Pfeifer and Kumasi Vines, the Director of Career Readiness, told Carey that her new role had no curriculum responsibilities. (Id. ¶¶ 22–23). They further "gaslighted and emotionally abused" Carey "to make her believe that it was her fault she had misinterpreted the position responsibilities." (Id. ¶ 23). Carey believed that the sudden "change in responsibilities . . . was in retaliation for the advocacy email to MSDE." (Id.).

2

In October 2020, BCPS hired an older African American woman to replace Carey in her former position. (Id. ¶ 24). In a transitional meeting, Vines "demeaned" Carey by asking, "how old are you?" (Id.). Carey felt that he only asked that question "because she was a woman and that he would not have asked a similar question of a male employee in her position." (Id.).

On January 28, 2021, Carey emailed Dean Kendall, an MSDE employee, from her personal email account with a message containing internal BCPS information. (Id. ¶¶ 24−25). On February 8, 2021, Carey received a Letter of Concern from Vines that reprimanded her about the "inappropriate" email to MSDE. (Id. ¶ 26). She believed that "she was being punished in ways that a male employee would not have been punished for seemingly minor errors." (Id.). Carey contacted Vines and tried to clarify if the Letter of Concern would affect her performance review and whether she would be placed on a Performance Improvement Plan ("PIP"), but Vines did not respond. (Id. ¶ 27). Jerome Jones, the Director of Labor Relations, later told Carey via email that the Letter was not disciplinary and that it did not automatically lead to a PIP or affect her performance review. (Id. ¶ 28).

Contrary to Jones' message, Vines called Carey on February 22, 2021 and "referenced retaliation, litigation, and termination" and stated that "the Letter would directly affect her performance rating." (Id. ¶ 29). Vines also said that "pushback" and "cooperation" had been issues with Carey since the beginning of her employment, but he could not provide specific examples. (Id. ¶ 31). Carey suspected that Vines was hostile towards her because she was a "successful black female employee" and because of her

emails to MSDE. (Id. ¶ 29). On March 4, 2021, Vines again told Carey that the Letter of Concern would "definitely be a factor" in her performance review. (Id. ¶ 33). Carey was concerned that Vines was deviating from the "standard protocol" outlined by Jones in order to harass her. (Id.). Additionally, Carey was aware that in late summer 2020, Heller committed a major miscalculation in managing a grant that resulted in sixteen overtime hours for Carey and the forced return of funds from BCPS to the state of Maryland. (Id. ¶ 20). Carey believed that Heller "[got] away with mistakes because he was a male" and that she "was clearly being held to a different standard due to her sex." (Id.).

As a result of her treatment at work, Carey suffered "extreme distress and anxiety," panic attacks, and sleeplessness, which caused her to take intermittent leave under the Family and Medical Leave Act ("FMLA"). (Id. ¶¶ 30, 34). Vines "refused to approve Plaintiff's leave slips resulting in Plaintiff having to take further FMLA leave." (Id. ¶ 35). Carey eventually resigned to avoid subjecting herself to the work environment at BCPS. (Id.).

On January 3, 2022, Carey filed her Complaint against BCBSC. (ECF No. 1). She filed an Amended Complaint on February 8, 2022 that alleges: sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Count I); hostile work environment under Title VII (Count II); FMLA interference (Count III); FMLA retaliation (Count VI); and sex and race discrimination in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 et seq. (Am. Compl. ¶¶ 37–87).

BCBSC moved to dismiss on May 10, 2022. (ECF No. 13). Carey filed an

Opposition on May 26, 2022, and BCBSC filed its Reply on June 7, 2022. (ECF Nos. 17, 18).

## II.   DISCUSSION

### A.   Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266,

268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.     Analysis**

   1.     **Title VII and FEPA Sex Discrimination**[2]

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee because he has "opposed" a practice that Title VII forbids. 42 U.S.C. § 2000e-3(a). A plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)).

Carey's Amended Complaint is rife with conclusory allegations which are insufficient to plead a Title VII violation for sex discrimination. (See United Black

---

[2] MFEPA is the Maryland state analogue of Title VII and federal courts apply Title VII caselaw in adjudicating MFEPA claims. Williams v. Silver Spring Volunteer Fire Dep't, 86 F.Supp.3d 398, 408 n.1 (D.Md. 2015) (citing Haas v. Lockheed Martin Corp., 914 A.2d 735, 742 (Md. 2007)). Accordingly, the Court's analysis of Carey's Title VII claim shall constitute its analysis of her MFEPA claims. See id.

Firefighters, 604 F.2d at 847 (stating that courts need not accept conclusory allegations as true)). These include her claims that: Pfeifer advised Carey to confront Heller "because Plaintiff was a woman," (Am. Compl. ¶ 16); Carey was "held to a different standard due to her sex," (id. ¶ 20); Vines asked Carey for her age "because she was a woman," (id. ¶ 24); Vines harassed her "based on her position as a black female employee," (id. ¶¶ 29, 33); Carey was "treated differently" because she was a woman, (id. ¶ 44); and that sex was a "determining" and "motivating factor in Defendant's unlawful conduct," (id. ¶¶ 47–48).

Further, the remaining facts in the Amended Complaint do not include allegations of direct evidence of discrimination. See Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) ("Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" (quoting Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999))). Accordingly, the Court will evaluate Carey's claim under the burden-shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a discrimination or retaliation claim under the McDonnell Douglas burden-shifting framework, Carey must eventually put forth a prima facie case by establishing that:

> (1) [s]he belongs to a protected class;
> (2) [s]he suffered an adverse employment action;
> (3) at the time of the adverse action, [s]he was performing his job at a level that met [her] employer's legitimate expectations . . . ; and
> (4) [s]he was rejected [or terminated] under circumstances giving rise to an inference of unlawful discrimination.

7

See Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011). The precise formulation of the required prima facie showing will vary in "differing factual situations," McDonnell Douglas, 411 U.S. at 802 n.13, and the elements were "never intended to be rigid, mechanized, or ritualistic," Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

The Court is mindful that a Title VII plaintiff need not satisfy all the elements set forth above to survive a motion to dismiss. See Swierkiewicz, 534 U.S. at 510 ("The prima facie case under McDonnell Douglas, however, is an evidentiary standard, not a pleading requirement."); accord Parker v. Child.'s Nat'l Med. Ctr., Inc., No. ELH-20-3523, 2021 WL 5840949, at *9 (D.Md. Dec. 9, 2021) ("At the motion to dismiss stage, a plaintiff need not establish a prima facie case of discrimination."). Instead, at the motion to dismiss stage, a plaintiff need only "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" Bing v. Brivo Sys., LLC, 959 F.3d 605, 617 (4th Cir. 2020) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)), cert. denied, 141 S.Ct. 1376 (2021). Thus, the plaintiff must generally show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Adams, 640 F.3d at 558. This requirement can be met by showing that "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

The Court considers the "totality of the circumstances" in determining whether

Carey has adequately alleged discrimination. See Strothers v. City of Laurel, 895 F.3d 317, 330–31 (4th Cir. 2018) ("[T]he connection between animus and conduct may be inferred from the totality of the circumstances."); see also Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017) (concluding that a court "may infer discriminatory intent from evidence of a general pattern of . . . discrimination in the practices of a defendant"); Guirkin v. CMH Physician Servs., LLC, No. 3:20CV59, 2020 WL 6829769, at *7 n.13 (E.D.Va. Nov. 20, 2020) ("Although [plaintiff's] individual allegations do not by themselves prove discriminatory animus, the totality of circumstances surrounding his termination gives rise to the inference that [plaintiff] was fired, at least in part, because of his [protected status].").

Notwithstanding these qualifiers, Carey's claim is deficient because the only allegations that could support an inference of discriminatory intent are those allegations relating to Carey's purported comparators. This Court has previously dismissed Title VII complaints in which the only allegations of discriminatory intent come from insufficient comparator evidence. See Chatelle v. Maryland, No. GLR-21-1734, 2022 WL 2953042, at *8 (D.Md. July 25, 2022) (dismissing complaint when comparator evidence fails to establish discriminatory intent or causation). Further, to the extent they intend to rely on comparator evidence, plaintiffs in the Fourth Circuit demonstrate that they are similarly situated with a comparator "by showing that they both (1) 'dealt with the same supervisor,' and (2) were 'subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Tinsley v. City of Charlotte, 854 F.App'x 495, 500–

01 (4th Cir. 2021) (quoting Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019)).

Here, Carey's comparator allegations are unconvincing. First, Carey compares her experience at BCPS to that of unidentified male employees. For example, after receiving the Letter of Concern, Carey states that she "felt that she was being punished in ways that a male employee would not have been punished" and that "male employees were not subjected to the same, similar, or any adverse treatment." (Am. Compl. ¶¶ 26, 57). Carey's statements are speculative, unsupported by specific facts, and fail to establish that these theoretical "male employees" engaged in the same conduct and received more favorable treatment. Thus, the unidentified male employees cannot serve as valid comparators.

Second, Carey tries to establish Heller as her comparator. She alleges that Heller made a serious miscalculation error that resulted in extra work for Carey and the loss of over $200,000 in funding for BCPS. (Id. ¶ 20). Carey further alleges that Heller was not punished, but that Carey received the Letter of Concern after emailing internal BCPS information to MSDE from her personal account which was a "seemingly minor error." (Id. ¶¶ 20, 26). Carey avers that "Mr. Heller was allowed to get away with mistakes because he was a male and Plaintiff was not. Plaintiff was clearly being held to a different standard due to her sex." (Id. ¶ 20). In her Opposition, Carey argues that these facts establish valid comparator evidence because Heller "made significantly greater mistakes yet went undisciplined." (Resp. Opp'n Mot. Dismiss ["Opp'n"] at 8, ECF No. 17). However, Carey's argument ignores the standard for comparator evidence articulated in Tinsley and Haynes. As BCBSC notes in its Reply, comparators must be similarly situated and

10

"engage[] in the same conduct." (Reply Resp. Mot. Dismiss at 5, ECF No. 18); Tinsley, 854 F.App'x at 500–01. Carey does not cite any authority to support her contrary theory that different conduct can establish comparator evidence.

In sum, Carey has no direct evidence of discrimination and her purported comparator evidence is insufficient to support a claim for Title VII and MFEPA sex discrimination.[3] Accordingly, the Court will dismiss Counts II and V.

### 2.   Hostile Work Environment

Title VII provides a cause of action for hostile work environment where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Mustafa v. Iancu, 313 F.Supp.3d 684, 695 (E.D.Va. 2018) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S.

---

[3] In the Amended Complaint, Carey also claims that BCPS discriminated against her based on race and national origin in violation of MFEPA. (Am. Compl. ¶ 87). In her Opposition, Carey explains that this was a typographical error and she meant to refer only to MFEPA sex discrimination. (Opp'n at 12). Regardless, it is unclear whether Carey pleads a race discrimination claim under Title VII. Carey's Equal Employment Opportunity Commission charge allegedly included a claim of race discrimination. (Am. Compl. ¶10). The Amended Complaint also contains several conclusory allegations relating to Carey's race, including that: Vines, Heller, and Pfeifer took action against Carey because she was "a successful black female," (id. ¶¶ 29, 33); BCPS acted with "intentional, deliberate, willful, malicious, reckless, and in callous regard of the rights of Plaintiff because of her race," (id. ¶ 50); and BCBSC discriminated against Carey by "failing to prevent race discrimination," (id. ¶ 51). Because these are conclusory allegations without specific factual support, the Court will dismiss Carey's Title VII race discrimination claim to the extent the Amended Complaint contains such a claim.

101, 117 (2002). To state a hostile work environment claim, a plaintiff must plead that there is "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race [or gender]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011)). In determining whether discriminatory conduct is pervasive enough to render the work environment objectively abusive, courts look to "all the circumstances[,] [which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[N]o single factor is required." Id. The court "can consider actions that contributed to the hostile work environment but occurred prior to [the bounds of the statute of limitations], under the continuing violation doctrine." U.S. EEOC v. Phase 2 Invs. Inc., 310 F.Supp.3d 550, 574 (D.Md. 2018). "In order to support a claim for hostile work environment, the alleged conduct must not only 'create an objectively hostile or abusive work environment, [but the] victim must also perceive the environment to be abusive.'" Nicole v. Grafton Sch., Inc., 181 F.Supp.2d 475, 482 (D.Md. 2002) (quoting Spriggs v. Diamond Auto Glass II, 242 F.3d 179, 183 (4th Cir. 2001)).

In support of her hostile work environment claim, Carey alleges several incidents of unwelcome conduct: Heller lashed out at Carey (Am. Compl. ¶ 16); Pfiefer advised Carey to confront Heller, (id.); Pfiefer encouraged Carey to apply for a new position and implied she would lose her job if she did not apply, (id. ¶¶ 17−18); Vines and Pfeifer took

12

away key responsibilities, (id. ¶¶ 22−23); Vines asked Carey for her age, (id. ¶ 24); Vines sent Carey a Letter of Concern, (id. ¶ 26); Vines reprimanded Carey twice and told her the Letter of Concern would impact her performance review, (id. ¶¶ 29−30, 33); and Vines denied her FMLA leave requests, (id. ¶ 26). Carey alleges that these incidents amount to "continuous harassment . . . directly related to her position as a statutorily protected class member." (Id. ¶ 63). BCBSC argues that any unwelcome conduct by BCBSC was unrelated to Carey's gender or race. (Mot. at 12−15). At bottom, the Court agrees with BCBSC and will dismiss Count II.

Viewing the facts set forth above in the light most favorable to Carey, her hostile work environment claim must fail because she does not include sufficient facts to connect her alleged mistreatment to her sex. As the Court explained above in its analysis of the Title VII discrimination claim, Carey's statements related to her gender are conclusory and she does not allege a single fact that would lead to the inference that BCPS's conduct occurred because of her status as a protected class member. Thus, she does not allege a claim for hostile work environment. See Ruffin v. Lockheed Martin Corp., 126 F.Supp.3d 521, 530 (D.Md. 2015) (dismissing hostile work environment claim on the basis that the "complaint is devoid of factual allegations that the hostile work environment was because of her race []or membership in any other protected class[]"), aff'd, 659 F.App'x 744 (4th Cir. 2016). Accordingly, the Court will grant BCBSC's Motion as to Count II.

### 3. FMLA Interference and Retaliation

Under the FMLA, eligible employees are entitled to twelve weeks of leave during a twelve–month period for covered reasons, including a serious health condition. 29 U.S.C.

§ 2612(a)(1)(D). Employers may not (1) "interfere with, restrain, or deny the exercise of" the right to that leave, or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a). A claim based on the first prohibition is an interference claim; one based on discrimination is considered a retaliation claim. Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th Cir. 2006). Carey's Amended Complaint invokes both types of FMLA claims.

First, to establish a claim for interference, a plaintiff must show: "(1) [s]he was an eligible employee; (2) [her] employer was covered by the statute; (3) [s]he was entitled to leave under the FMLA; (4) [s]he gave [her] employer adequate notice of [her] intention to take leave; and (5) the employer denied [her] FMLA benefits to which [s]he was entitled." Sherif v. Univ. of Md. Med. Ctr., 127 F.Supp.3d 470, 477 (D.Md. 2015). Plaintiffs must also show that they were prejudiced by the violation. Vannoy v. Fed. Rsrv. Bank of Richmond, 827 F.3d 296, 301–02 (4th Cir. 2016); Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 82 (2002) ("[29 U.S.C.] § 2617 provides no relief unless the employee has been prejudiced by the violation."). "Such prejudice can be proven by showing that the employee lost compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation; or suffers some loss in employment status remediable through appropriate equitable relief, such as employment, reinstatement, or promotion." Edusei v. Adventist Healthcare, Inc., No. DKC 13-0157, 2014 WL 3345051, at *5 (D.Md. July 7, 2014) (cleaned up) (quoting 29 U.S.C. § 2617(a)(1)).

Here, Carey provides only a bare recitation of the elements of an interference claim and she does not allege any facts showing that she was prejudiced by Vines' refusal to

14

approve her leave. (See Am. Compl. ¶¶ 35, 70−75). Carey avers that she suffered "trauma" and "irreparable harm and injury" following the denial of her leave (id. ¶¶ 35, 75), but she does not allege that she lost compensation or benefits, sustained a monetary loss, or otherwise suffered some loss in employment status. Accordingly, Carey has failed to state a claim for FMLA interference and the Court will dismiss Count III.

Second, to establish a claim for retaliation, a plaintiff must show "that the employer discriminated against her for exercising her FMLA rights." Edusei, 2014 WL 3345051 at *5. Courts often analyze retaliation claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–06 (1973). Yashenko, 446 F.3d at 551. "Thus, to succeed on his retaliation claim, [a plaintiff] must first make a prima facie showing 'that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity.'" Id. (quoting Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998)).

Carey alleges that she engaged in protected activity by sending an advocacy email to MSDE and that BCPS retaliated by denying FMLA leave. (Am. Compl. ¶¶ 79−80; Opp'n at 12). BCBSC argues that Carey's allegations do not constitute a retaliation claim because she does not allege that BCPS discriminated against her for exercising her rights under the FMLA. (Mot. at 18−19). The Court agrees with BCBSC. Although Carey insists that the advocacy email constitutes protected activity under the FMLA, there is no support for her position in the statute or in the case law. Accordingly, the Court will dismiss Carey's retaliation claim.

## III.  CONCLUSION

For the foregoing reasons, the Court will grant Defendant BCBSC's Motion to Dismiss (ECF No. 13). A separate Order follows.

Entered this 28th day of November, 2022.

                                                   /s/
                              George L. Russell, III
                              United States District Judge